

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH:EL
F. #2023R00184

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 30, 2025

<u>By ECF</u>
The Honorable Carol Bagley Amon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. Yveler Marcellus
          <u>Criminal Docket No. 24-9 (S-1) (CBA)</u>

Dear Judge Amon:

The government respectfully submits this letter in anticipation of sentencing in the above-captioned case, which is scheduled for Wednesday, January 7, 2026.  As proved at trial, the defendant and his co-conspirators participated in an elaborate money laundering scheme through which victims were fraudulently induced to send checks to various locations in the Eastern District of New York, where the defendant and his co-conspirators would retrieve the checks, deposit the checks into bank accounts controlled by the conspirators and share the proceeds with other co-conspirators for their own financial gain.  As described herein, the scheme caused over $10 million in losses to victims, many of whom were elderly.

In light of the seriousness of the offense, the widespread harm that it caused to victims and the defendant's attempt to obstruct the government's investigation, the government respectfully submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 188 to 235 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing.  <u>See</u> 18 U.S.C. § 3553(a). The government further requests that the Court order forfeiture in the amount of $185,000 and restitution in the amount of $6,844,491.35.

I.      <u>Offense Conduct</u>

The offense conduct is accurately described in the Pre-Sentencing Investigation Report dated December 2, 2025 (the "PSR").

Between at least October 2022 and December 2023, the defendant participated in an elaborate money laundering scheme through which co-conspirators based in India (the "Call Center Co-Conspirators") contacted victims and fraudulently induced them to send checks and other forms of payment to addresses in the Eastern District of New York and elsewhere under the

guise of a "Tech Scheme" and "Mortgage Refinancing Scheme," among others (collectively the "Fraudulent Scheme" or the "Scheme"). PSR ¶¶ 7-10, 13. Through the Fraudulent Scheme, the Call Center Co-Conspirators contacted victims by telephone and directed them to send money instruments to various addresses in the Eastern District of New York and elsewhere under false pretenses, including that the victims' money was compromised in their bank account or that the victim was making a payment towards their refinanced mortgage. Id.

The Scheme was coordinated by Individual-1, an Indian national who managed a call center in India. Id. ¶¶ 10-11. Call Center Co-Conspirators working under Individual-1 targeted individuals in the United States through the Fraudulent Scheme and fraudulently induced them to provide payment by check or money order, as described above. Id. In or around January 2022, co-defendant Daniel Vernon began working with Individual-1 to perpetuate the Fraudulent Scheme. Id. ¶ 11. Specifically, Vernon would provide Individual-1 with his name, the names of the defendants or the names of other individuals whose bank accounts the defendants recruited to be used in furtherance of the Scheme ("Accountholder Co-Conspirators"), which names the Call Center Co-Conspirators instructed victims to address money instruments to. Id. ¶ 17.

Vernon provided Individual-1 with mailing addresses to which Call Center Co-Conspirators, in turn, instructed victims to send the fraudulently obtained checks or money orders. Id. ¶¶ 17-19. These addresses included several "virtual offices" with P.O. boxes that Vernon opened through a company that provides office spaces for rent. Id. Vernon opened the virtual offices under a variety of aliases and false business names at locations on Wall Street in New York, New York; in Manhasset, New York; in Lake Success, New York; and Valley Stream, New York (the "Virtual Offices"). Id. Defendant Marcial also coordinated with Vernon to receive fraudulently obtained checks at the residence of Marcial's acquaintance in Rosedale, Queens (the "Rosedale Address" and, together with the Virtual Offices, the "Mailing Addresses"). Id. ¶ 19.

After Individual-1 received the names and delivery addresses, the Call Center Co-Conspirators fraudulently induced victims to send money instruments addressed to the accountholder name provided by Vernon under the guise of one or more of the Fraudulent Schemes described above. Id. ¶ 10, 18. After victims sent funds to the provided address, certain of the defendants, including defendants Vernon, Marcial, Marcellus, and Mims—and on limited occasions, defendant Henry—picked up the checks from a given Mailing Address and deposit the checks into their own account or the account of the defendant or Accountholder Co-Conspirator that the check was addressed to. Id. ¶ 20. The accountholder received a portion of the face value of the check, up to 10-15% of the face value of the check. Id. Where a defendant recruited a new Accountholder Co-Conspirator into the Fraudulent Scheme, that defendant would also receive a cut of the check, akin to a "finder's fee." Id. ¶ 21. After the defendant and Accountholder Co-Conspirators received their respective "cuts" of the victim check, the remainder of the funds were sent back to Individual-1 in India via cryptocurrency transfer or by transferring funds to other bank accounts whose owners would, in turn, send the funds back to Individual-1. Id. Typically, the defendant or Accountholder Co-Conspirator whose account the check was deposited in initiated the wire transfer. Id.

On October 15, 2024, a grand jury sitting in the Eastern District of New York returned a superseding indictment (the "S-1 Indictment") charging the defendant and four other codefendants with one count of conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349 and one count of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), in connection with their participation in the Fraudulent Schemes.[1]  See ECF No. 136.  Trial commenced on September 9, 2025.

As demonstrated at trial, the defendant's role in the Fraudulent Schemes was extensive.  The defendant was recruited into the Fraudulent Scheme in or about October 2022 by co-conspirator Felix Marcial.  Trial Tr. 60:7-62:12; 66:11-23.  At first, the defendant simply provided Marcial with access to his bank accounts to be used in furtherance of the Fraudulent Schemes.  The defendant's role grew over time, and he began acting as a "recruiter" who recruited new co-conspirators to provide their accounts to be used in furtherance of the scheme and a "depositor," like Vernon and Marcial, who picked up checks sent to the Mailing Addresses by victims who had been defrauded by the Call Center Co-Conspirators.  Trial Tr. 67:23-68:5; 134:2-135:8.  In exchange for depositing checks and allowing checks to be deposited into his bank accounts, the defendant was paid up to 15% of the face value of the checks.  Trial Tr. 68:20-25.

Through his role, the defendant coordinated with Vernon and Marcial to launder victim proceeds by picking up and depositing victim checks from various Mailing Addresses, including locations at a Virtual Office location in Manhasset (the "Manhasset Regus") and the Rosedale Address, which Marcial had arranged to be used as a Mailing Address through an individual named Niah.  Trial Tr. 243-248; 114:12-116:1.  Evidence presented at trial revealed that in addition to using his own accounts and the accounts of Accountholder Co-Conspirators he recruited to be used in the Scheme, the defendant deposited victim checks into co-conspirator accounts provided to him by Vernon and Marcial.  For example, on February 14, 2023, the defendant deposited an $80,000 check sent by victim Carol Johnson into an account held by co-defendant Tatiana Williams at a Chase bank location near the Manhasset Regus.  See Stipulation S-2, GX 128-L, 128-L.1, 128-L-1A; Trial Tr. 65:20-66:0 (Vernon identifying the defendant in still image); 658:4-663:13.  The check was addressed to "Tatiana Williams."

---

[1]  A grand jury sitting in the Eastern District of New York initially returned an indictment on January 8, 2024, charging defendant Marcellus and defendants Daniel Vernon, Felix Marcial and Tatiana Williams with one count of conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349 and one count of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), in connection with their participation in the Fraudulent Schemes. ECF No. 1 (the "Original Indictment"). Defendants Vernon, Marcial and Williams each pled guilty to Count One of the Original Indictment pursuant to plea agreements. Defendants Asheem Henry, Daquan Mitchell, George Mims and Rahmel Thompson were each charged in the S-1 Indictment and pleaded guilty to Count One of the S-1 Indictment pursuant to plea agreements.

3





Only days later, on February 16, the defendant was pulled over by the Nassau County Police Department in close proximity to the Manhasset Regus. See S-4. The next day, February 17, 2025, Nassau County Police intercepted three packages at the Manhasset Regus that were revealed to be victim checks addressed to G Mims, Inc., Felix Marcial and Erica Barcliff. Trial Tr. 550:8-560:25 (testimony of Detective Gregory Fisher); GX 605, 605-A, 606, 606-A, 607, 607-A. The cumulative value of the checks was $166,000. Shortly after law enforcement intercepted the checks, law enforcement observed the defendant arrive to pick up

4

the packages and appear upset after the Regus employees informed him that the packages were not at the location. Trial Tr. 560:8-21. After the defendant departed, he was again pulled over and law enforcement confirmed his identity. See Trial Tr. 571:7-25 (testimony of Detective Andrew Colonna). During the car stop, law enforcement observed the defendant's phone receiving an incoming call from a number belonging to Vernon. Trial Tr. 574:7-575:9; GX 611. Vernon testified that, following the February 2023 car stops, the defendant informed Vernon that he was concerned about law enforcement's detection of the Fraudulent Scheme at the Manhasset Regus, which the defendant believed to be "hot" (meaning that checks could no longer be sent there). Trial Tr. 243:20-246:2. After the defendant identified the Manhasset Regus as a "hot" location, the conspirators began using residential addresses like the Rosedale Address to receive victim checks. Id.

To avoid detection by law enforcement, the defendant used Telegram—an encrypted text-messaging application— to communicate about the scheme with Vernon, Marcial and other co-conspirators. Trial Tr. 69:10-70:18; see generally GX 501-A (Telegram chat between Vernon and Marcial; GX 300 (text chat between Vernon and defendant); GX 500 (Telegram chat between Marcial and defendant). As Vernon testified at trial—and was corroborated by text message evidence between Vernon and the defendant—the defendant and Vernon texted extensively about the Fraudulent Schemes, including to coordinate the defendant's receipt deposit of victim checks into the accounts of co-defendants and other Accountholder Co-Conspirators, as well as the transfer of Scheme proceeds to the Call Center Co-Conspirators abroad. Vernon routinely discussed with the defendant that the Call Center Co-Conspirators required confirmation that victim proceeds had been deposited and would be wired to the Call Center Co-Conspirators abroad. See e.g., Trial Tr. 171:6-175:21; 210:20-216:12 (Vernon testimony regarding text discussions with defendant about the Fraudulent Schemes); GX 300 at 226-228 (defendant discussing that he is walking Accountholder Co-Conspirator through wire transfer process); 270-72 ("Need screenshots guy they trying to sleep" (referring to Call Center Co-Conspirators)); 341 ("Send screenshot dnt babble so I can send to them guy … Asap so he can sleep guy" (referring to Call Center Co-Conspirators)). Over the course of their communications, Vernon explicitly discussed with the defendant that Vernon was working with an individual in India to launder stolen proceeds from victims. Trial Tr. 174:2-25.

The defendant took a number of sophisticated measures to ensure that he was able to successfully launder victim proceeds. First, the defendant, who often went by the nickname "Melo," created a fake business titled "Marcellus Venture Group," which he provided to Vernon to open a Regus Mailing Address, so that it could be used to receive victim checks. Trial Tr. 96:5-97:3; Government Exhibit ("GX") 6. The defendant also opened various bank accounts across at least four different financial institutions, which he used—and provided to Vernon and Marcial to be used—in furtherance of the scheme, so that victims' checks could be deposited and the proceeds could be laundered to co-conspirators. See Stipulation S-2, GX 103-107; Trial Tr. 135:13-136:10. In an effort to legitimize the accounts, the defendant opened one of the accounts in the name of the false business, "Marcellus Venture Group." PSR ¶ 14; GX 107. Through these accounts alone, the defendant laundered in excess of $1.35 million of Scheme proceeds. See ECF No. 377, Ex. A.

The defendant also recruited various individuals as Accountholder Co-Conspirators, whose bank accounts the defendant utilized to launder Scheme proceeds. These

Accountholder Co-Conspirators included three women who worked for the defendant, Lorraine Valderrama, Joyce Person and Shannon Hilliard, as well as the defendant's ex-girlfriend Justine Pitre and his cousin, August Carmona.  See Trial Tr. 139:24-141:1; GX  108-09 (Hilliard Accounts); 110-11 (Person Accounts); 112-14 (Pitre Accounts); 115-17 (Valderrama Accounts); and 143 (Carmona Account).  At trial, Person, Valderrama and Hilliard each provided testimony explaining how the defendant approached them with an opportunity to make money simply by providing him access to their bank accounts and, subsequently, making  wire transfers at his direction.  Trial Tr. 413:7-414:13 (Person); 479:9-480:18 (Hilliard); 502:13-503:13.  Person, Hilliard and Valderrama each testified that in addition to instructing them to make wire transfers, the defendant also instructed them to open a second bank account that he could use to deposit and transfer funds.  Trial Tr. 425:12-426:20 (Person); 48:4-489:5; 510:12-511:13.  Person also testified that the defendant instructed her to lie to bank officials in order to ensure that laundered funds were successfully transferred and that she became concerned when the defendant began putting money into her accounts without her knowledge.  Trial Tr. 437:10-443:16; 445:18-446:3; GX 111-B, 111-F.5.

The defendant also conspired with Vernon to launder victim proceeds deposited in a fraudulent account belonging to a fictitious individual named "Ethan Wood" through accounts belonging to Joyce Person and Lorraine Valderrama.  Trial Tr. 216:13-24.  Vernon testified that the defendant deposited Scheme checks into the Ethan Wood account, which proceeds Vernon was unable to retrieve because the account was fraudulent.  Trial Tr. 216:25-218:10.  Accordingly, the defendant and Vernon conspired to deposit checks addressed from the Ethan Wood account into accounts belonging to Person and Valderrama. Trial Tr. 215:11-220:25; see also GX 141, 141-A, B, C, D.  Valderrama testified that when issues arose with depositing the Ethan Wood check into her account, the defendant Facetimed an individual purporting to be Ethan Wood to resolve the issue.  Trial Tr. 507:7-509:20.  The defendant laundered over $1,000,000 through accounts belonging to Accountholder Co-Conspirators who he recruited into the Scheme (including Ethan Wood funds).  See ECF No. 377, Ex. A.

The defendant's Telegram conversations with Marcial demonstrate the extent of his role.  See GX 500.  As evidenced in Telegram communications presented at trial, the defendant and Marcial routinely discussed the receipt of victim checks with Marcial and coordinated which bank accounts the checks should be deposited into, including accounts held by the defendant and Accountholder Co-Conspirators that the defendant recruited into the scheme.  See generally, GX 500, 500-A through W; Trial Transcript 626-649 (testimony of USPIS Fraud Analyst Erin Markevitch).  The defendant and Marcial also discussed how they intended to share in the proceeds of victims checks they deposited.  See GX 500 at 24-27. In addition to communications about the Fraudulent Scheme, Telegram and text communications between the defendant Marcial revealed that they engaged in other forms of fraud, including other types of check fraud, see GX 500 at 30-33, 500-J, 600, S-5, and credit card fraud, see generally GX 503.

A.    The Defendant's Attempt to Obstruct Justice

On June 10, 2025, the government moved to compel the defendant to provide a handwriting sample for purposes of conducting a handwriting analysis against certain victim

checks that had been endorsed and deposited into co-conspirator accounts.  On June 16, 2025, the defendant consented to providing a handwriting sample to the government.  ECF No. 283.

On June 18, 2025, the defendant, accompanied by his attorney, met with Postal Inspectors from the United States Postal Inspection Service for purposes of providing a handwriting sample, which is attached hereto as Exhibit 1. PSR ¶ 83.  The defendant was instructed by the Postal Inspectors to copy a variety of text and, depending on what he was copying, write either in print (see e.g., Ex. 1 at 1, 20-49) or cursive (see e.g., Ex. A at 2-19).  PSR ¶ 83.  The defendant was also instructed to sign and print his name at the bottom of each page.  Id.  During the administration of the exemplar, the defendant was reminded to write in script when the agents noticed that he was writing what appeared to be in slanted print.  Id.  The defendant indicated that he "does not really write in script" and continued to write in what appeared to be slanted print on pages in which he was instructed to write in script.  Id.; see e.g., Ex. A at 2-19.  On each of the 110 pages of the exemplar, the defendant also provided his signature in print.  PSR ¶ 83.  The defendant's print signature, his representation that he "does not really write in script," and non-cursive writing samples are plainly inconsistent with various bank documents (GX 103-A to GX 107-A, attached hereto as Exhibit B), DMV records (attached hereto as Exhibit C), the bond signed in this case, and the CJA financial affidavit submitted to the Court on June 10, 2025, in which the defendant signed his name in cursive.

### B. Loss Amount

As described in the government's filings concerning the defendants' roles and restitution, the government has identified over 100 victims who suffered approximately $12,488,884.33 in losses as a result of the Fraudulent Schemes.  See ECF Nos. 267, 377.

### II. The Defendant's Guidelines Range

### A. The Guidelines Calculation

The government agrees with the Guidelines calculations set forth by the United States Probation Department ("Probation") in the PSR.  Probation calculated the defendant's offense level as follows:

| | | |
|---|---|---|
| Mail and Wire Fraud Conspiracy Base Offense Level (U.S.S.G. §§ 2X1.1(a), 2B1.1(a)(1)) | | 6 |
| Plus: | Calculated Loss Above $3,500,000 (U.S.S.G. § 2B1.1(b)(1)(J)) | +18 |
| Plus: | Substantial Hardship to Five or More Victims (U.S.S.G. § 2B1.1(b)(2)(B)) | +4 |
| Plus: | Substantial Part of Scheme Committed from Outside of the United States (U.S.S.G. § 2B1.1(b)(10)(C)) | +2 |
| Money Laundering Base Offense Level (U.S.S.G. § 2S1.1(a)(1)) | | 30 |

| | | |
|---|---|---:|
| Plus: | Defendant Convicted Under 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1(b)(2)(B)) | +2 |
| Plus: | Offense Involved Sophisticated Laundering (U.S.S.G. § 2S1.1(b)(3)) | +2 |
| Plus: | Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 |
| Total: | | 36 |

PSR ¶¶ 85–96. The PSR estimates that the defendant falls into criminal history category I, resulting in an advisory sentencing range of 188 to 235 months' imprisonment. PSR ¶¶ 99, 130.

B.    The Defendant's Objections to the PSR Should Be Rejected

The defendant, in an objection memorandum submitted on December 8, 2025, objects to various facts alleged in the PSR and the application of various sentencing enhancements. ("Def. PSR Obj."). The defendant's objections to the PSR should be wholly rejected.

First, citing no supporting legal authority, the defendant contends that the Court should treat this case "as if Mr. Marcellus pled guilty, and accepted responsibility" in light of the defendant's failed July 30, 2024 change of plea. Def. PSR Obj. at 1. Accordingly, the defendant argues that the Court should calculate a Guidelines range of 46 to 57 months based on the government's Guidelines estimate in the plea agreement tendered to the defendant at the time of his failed guilty plea. Id. This argument lacks merit. In the year after the defendant's failed plea, during which the defendant refused to accept responsibility for his role in the Fraudulent Schemes, law enforcement identified dozens of additional victims of the Fraudulent Schemes, as well as additional accounts used by the defendant to perpetuate the Scheme, Accountholder Co-Conspirators recruited into the Scheme by the defendant and evidence of the extent of the defendant's involvement in the Scheme. Further, as described above, the defendant also attempted to obstruct justice during that time. Nonetheless, the defendant maintained his desire to go to trial at a July 18, 2025 conference on the eve of trial during which the Court specifically confirmed that the defendant did not intend to enter a change of plea and wished to proceed to trial. The defendant's argument is baseless and should be rejected.

The defendant also objects to the PSR's descriptions that he was aware of the "larger breadth of the scheme," "the scope of the fraud through his discussions with Marcial," and "Indian call center." Id. at 2; PSR ¶¶ 14, 58. This argument ignores evidence presented at trial. As described above, Vernon testified that he discussed the fraudulent nature of the Scheme with the defendant, which was corroborated by text message communications in which Vernon referenced the Call Center Co-Conspirators with the defendant and asked the defendant to provide proof that he had sent laundered funds to the conspirators abroad. Further, the defendant was aware of the breadth of victims involved in the Scheme, since he picked up and deposited victim checks into co-conspirator accounts beyond only those that he recruited into the conspiracy himself.

8

The defendant objects to the application of the obstruction of justice enhancement, pursuant to U.S.S.G § 2S1.1.  Def. PSR Obj. at 2.  As provided above, the defendant's prior signatures and handwriting samples evidence that he is able to write in cursive and that the exemplar provided to investigating agents at the June 18, 2025 meeting was not a true sample of his cursive handwriting.  To the extent the defendant is denying that he told Postal Inspectors "does not really write in script," the government is prepared to prove those facts at a Fatico hearing.  At such a hearing, the government will offer the testimony of the Postal Inspector who administered the exemplar that the defendant did, in fact, make this statement.  This objection should also be rejected and the enhancement for obstruction of justice should be applied.

The defendant next contends that he did not engage in "sophisticated laundering" under U.S.S.G. § 2S1.3(b)(3).  Def. PSR Obj. at 2.  This, however, is also belied by the trial record.  Application Note 5 to § 2S1.3(b)(3) provides that "sophisticated laundering" may include the use of fictitious entities or multiple levels of transactions, among other things.  As described above, the defendant utilized a fictitious entity, "Marcellus Venture Group," in furtherance of the scheme and opened a bank account in the same name to be used to deposit victim checks and send money to Call Center Co-Conspirators.  Further, evidence at trial revealed that the defendant conspired with Vernon to deposit victim checks into an account held in the fictitious name "Ethan Wood," which funds he then laundered through Person's and Valderrama's bank accounts.  This evidence, alone, is sufficient to find that the defendant engaged in sophisticated laundering. The defendant's objection should be rejected.

The defendant also objects to the application of an enhancement for a substantial part of the fraudulent scheme being committed from outside the United States, pursuant to U.S.S.G. § 2B1.1(b)(10).  Def. PSR Obj. at 2.  First, as discussed above, Vernon's trial testimony and text communications between the defendant and Vernon reflect that the defendant was aware that Vernon was working with—and that proceeds were being sent to—individuals abroad.  In any event, Guidelines § 2B1.1(b)(10) provides no requirement that the defendant was aware that the scheme was committed from abroad in order for the enhancement to apply, and the defendant cites no law to the contrary.  The defendant's objection should be rejected, and the enhancement should be applied.

Finally, the defendant summarily concludes that an offense level of 36 and Guidelines range of 188-235 months "is incorrect and unfair."  Def. PSR Obj. at 2.  For the reasons provided herein, each of the enhancements provided in the PSR's Guidelines calculation are supported by the evidence of the defendant's offense conduct and subsequent obstruction.  The defendant's conclusory objection should be wholly rejected.

III.    A Guidelines Sentence of Incarceration Is Appropriate

A.    Legal Standard

While the Guidelines are advisory rather than mandatory, district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences.  United States v. Booker, 543 U.S. 220, 245 (2005); see 18 U.S.C. § 3553(a).  The Supreme Court has elucidated the proper procedure for sentencing courts to follow in light of Booker: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a

9

matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the Court] may not presume that the Guidelines range is reasonable.  [The Court] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).

The Section 3553(a) factors that the Court must consider in sentencing the defendant include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution.

B.      A Guidelines Sentence is Warranted

The government respectfully requests that the Court impose a term of imprisonment within the Guidelines range of 188 to 235 months' imprisonment.  A sentence within that range is sufficient but not greater than necessary to achieve the goals of sentencing, and it would appropriately reflect important factors including the nature and circumstances of the offense and the need for deterrence.  See 18 U.S.C. § 3553(a).

1.      The Seriousness, Nature and Circumstances of the Offense

The fraud at issue in this case was serious and resulted in tremendous harm to its victims.  The victims, who were often elderly or otherwise vulnerable, were fraudulently induced to send checks to the coconspirators under false pretenses and, often, the false impression that their money was at risk.  Because of the pressure placed on the victims by the Call Center Co-Conspirators, the victims routinely sent large sums of money to the defendants, often from savings or retirement accounts that the victims relied on for their financial security.  As detailed in the numerous Victim Impact Statements provided to the Probation department and by victim testimony at trial, see Trial Tr. 36:11-49 (testimony of B. Blasingame); 580:1-596:21 (testimony of D. Vanden Berg) ;712:19-723:18 (testimony of R. Blesener), the defendant and his co-conspirators stole from dozens of victims, often to the tune of tens of thousands, or even over one hundred thousand dollars per victim.  As a consequence of the defendant's conduct, many of these victims, who handed over their life savings, retirement or other money they planned to rely on later in life, have been left scared and uncertain about their financial security in the future.

The defendant's role in the Scheme was extensive.  As described above, the defendant played a significant role as a recruiter who obtained access to multiple bank accounts from Accountholder Co-Conspirators to be used in furtherance of the Scheme (in addition to his own accounts), as well as a depositor who coordinated with Vernon and Marcial to pick up and deposit checks into accounts belonging to other co-conspirators (beyond those who he, himself, recruited into the Scheme).  Through his role, the defendant personally laundered and was aware of the large quantity and sums of checks obtained through the scheme, which were being

laundered through a number of accounts, including beyond those recruited into the Scheme by the defendant, himself.  Nonetheless, the defendant persisted in his role, laundering millions of dollars through accounts that he recruited himself, alone.  The defendant did so to fund a lifestyle of luxury and excess using victims' hard-earned money.  Indeed, as Vernon testified at trial, he would often see the defendant out at nightclubs—as often as three times a week—and the defendant routinely posted pictures of himself on Instagram wearing designer clothing and jewelry under the username "Richlifemellow."  Trial Tr. 193:2-11, 64:1-65:19; GX 608.

The outsized impact of the defendants' actions on the victims of the Scheme cannot be understated, and the defendant's brazen use of victim proceeds to live a lavish lifestyle at the expense of those victims militates in favor or a Guidelines term of imprisonment.

### 2.    Affording General Deterrence

A Guidelines sentence is also necessary to deter similarly situated individuals from engaging in this behavior.  See 18 U.S.C. § 3553(a)(2)(B).  Unfortunately, telephone schemes like the Fraudulent Scheme in this case have long been prevalent and often target elderly and vulnerable victims.[2]  More generally, check fraud is increasingly prevalent, having risen 385% since the beginning of the pandemic.  See Treasury Announces Enhanced Fraud Detection Process Using AI Recovers $375M in Fiscal Year 2023, U.S. Department of the Treasury (Feb. 28. 2024), https://home.treasury.gov/news/press-releases/jy2134 (last visited Feb. 28, 2025).

Schemes like the Fraudulent Scheme here are lucrative because they can target a wide array of victims who are vulnerable, often elderly and often scared by the information conveyed to them by coconspirators speaking with them on the phone.  While the defendant did not directly interact with victims, his participation—including by (i) providing his own accounts to be used to launder victim money, (ii) recruiting co-defendants and other Accountholder Co-Conspirators who made their accounts available for use in the Fraudulent Scheme, and (iii) laundering funds through other accounts by depositing checks in those accounts—was crucial to the Schemes' ability to defraud the victims, and send money into the hands of the defendants, Accountholder Co-Conspirators and Call Center Co-Conspirators abroad.  A serious sentence would deter individuals from engaging in schemes that assist those who prey on vulnerable victims through phone or check scams, even where the precise nature of the scam is not known to all conspirators, but whose involvement and complicity is nonetheless necessary for the scheme's success.

---

[2]    See, e.g. Concepción de León, $300 Million Telemarketing Scheme Preyed on Older People, U.S. Says, N.Y. Times (Oct. 28, 2020), https://www.nytimes.com/2020/10/28/us/telemarketing-scheme-elderly-people.html (last visited Feb. 27, 2025); A Byte Out of History: Turning the Tables on Telemarketing Fraud, Federal Bureau of Investigation Archives (Dec. 8, 2010), https://archives.fbi.gov/archives/news/stories/2010/december/telemarketing_120810/telemarketing_120810 (last visited Feb. 27, 2025).

Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citation omitted).  As Judge Garaufis has recognized, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." United States v. Johnson, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018); see also United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").  This is true, in part, because "[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." Johnson, 2018 WL 1997975 at *5 (internal quotation marks omitted); see also Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  This is especially true when the potential rewards for would-be criminals who are not caught can be substantial.

### 3.    Specific Deterrence

A Guidelines sentence is also appropriate to provide specific deterrence to the defendant in light of his efforts to obstruct law enforcement's investigation by providing a false handwriting sample to investigating agents.  Contrary to the defendant's contention that he attempted to accept responsibility for his role in the offense, the defendant sought to capitalize on an opportunity to provide an altered handwriting sample to investigating agents and falsely exonerate himself.  A Guidelines sentence would adequately deter this defendant—and others— from engaging in similar attempts to obstruct criminal investigations.

### 4.    Restitution and Forfeiture

As described in detail in the government's submissions regarding the defendants' roles and restitution, the government submits that the Court should enter a "hybrid" restitution order, ordering that that the defendant pay $6,844,491.35 in restitution, which constitutes the loss to all identified victims who were defrauded during the period of the defendant's participation in the Scheme.  See United States v. Yalincak, 30 F.4th 115, 125-26 (2d Cir. 2022); see also ECF Nos. 267, 377.  In light of the defendant's extensive knowledge and participation in the Scheme—particularly that the defendant laundered victim checks through accounts other than those that the defendant himself recruited through the Scheme—the government submits that the defendant should be held liable for restitution for all victims of the Scheme beginning from the time he joined in October 2022 until the date of his arrest in January 2024.

The government further submits that the Court should enter an order of forfeiture in the amount of $185,000, to which the defendant has consented. See ECF No. 355.

IV.    Conclusion

      For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the advisory Guidelines range of 188 to 235 months' imprisonment and order forfeiture in the amount of $185,000 and restitution in the amount of $6,844,491.35.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

By:    /s/_____
Elias Laris
Assistant U.S. Attorney
(718) 254-6599

cc:    Counsel of Record (via ECF)
      Probation Officers Frank Nikolaidis and Maxine Marquez